## KANSAS CITY SOUTHERN RY. CO. v. JONES. (No. 3122.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 25, 1926. Rehearing Denied March 18, 1926.)

**1. Master and servant ⬥286(29).**

In action under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for death, whether bell of locomotive which struck employee was rung *held* for jury.

**2. Master and servant ⬥265(14).**

Car inspector, struck by train, must be assumed, in absence of evidence to contrary, to have possessed normal hearing and sight.

**3. Master and servant ⬥213(3)—Car inspector held not to assume risk of failure to ring locomotive bell, though possessing knowledge of scheduled time of train's arrival (federal Employers' Liability Act [U. S. Comp. St. §§ 8657–8665]).**

In action under federal Employers' Liability act (U. S. Comp. St. §§ 8657–8665) for death of car inspector struck by locomotive, deceased did not assume risk of negligent failure to ring bell, even if he assumed risk from operation of train on account of his knowledge of schedule of time of its arrival.

On Motion for Rehearing.

**4. Master and servant ⬥289(30).**

Evidence of contributory negligence of car inspector struck by locomotive *held* for jury.

Appeal from District Court, Bowie County; Hugh Carney, Judge.

Action by Leonard Jones, administrator of D. R. Ferguson, deceased, against the Kansas City Southern Railway Company. Judgment for the plaintiff, and defendant appeals. Affirmed.

The action was brought under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) by the administrator, to recover damages for the benefit of the minor children of D. R. Ferguson, the deceased. The death of D. R. Ferguson occurred while he was in the service of appellant as a car inspector at Leesville, La., on February 12, 1922. As claimed by the administrator, the deceased was killed in appellant's yards at Leesville while he was between the main line track and the passing track, engaged in the duties of inspecting cars being used to make up a freight train, by being struck by a passenger train going north through the yards on the main line track and approaching the depot. It was alleged that the appellant was guilty of negligence proximately resulting in the death of D. R. Ferguson, in that: (1) There was failure to diminish the light given out by the headlight of the passenger locomotive as it passed through the yards; (2) there was failure to ring the bell and to blow the whistle of the passenger locomotive in warning of the approaching and passing of the train through the yards; and (3) the passenger train was operated through the yards at a higher rate of speed than was customarily done.

The appellant answered by general denial, and further specially pleaded that, if it be true, as alleged, that the deceased was killed by appellant's passenger train, his death was the proximate result of a risk and danger assumed by him in the course and performance of the duties of his employment, setting out at length the details. The appellant further specially pleaded, setting out the grounds, assumed risk and danger of being struck by reason of the operation of cars through the yards; that the deceased was struck and killed solely by reason of his own negligence in knowingly placing himself too near its main line track and moving train; that the passenger locomotive was equipped with a device for diminishing the light produced by the headlight as required by the order of the Interstate Commerce Commission, and that the deceased assumed any risk or danger, if any there were, of failure to diminish the light produced by the headlight, because the deceased fully knew that for a long time before the injury it was the rule of the company and custom of employees operating passenger locomotives on the main line track through the yards into the station of Leesville, not to dim or diminish the light.

The case was tried before a jury, and, in keeping with the special findings of the jury, the court entered judgment for the plaintiff.

The deceased was employed as a car inspector by the appellant in its yards at Leesville, La., and he had been working in that yard for 12 years. He was 62 years old, and was 5 feet 8 or 9 inches tall. His daily hours

of work were from 2 o'clock in the afternoon until 10 o'clock at night. Appellant is engaged in interstate and intrastate commerce. Leesville is the county seat of Vernon parish, having a population of about 4,000, and is a freight division point. The depot, 165 feet long, is located west of and adjacent to the main line track. The main line track runs practically north and south. Paralleling the main line track, and on the east side of it, is a passing track extending into the yard. The distance between the main line track and the passing track from center to center is 15 feet, and from rail to rail it is 10 feet. There is approximately a 6-foot clearance between two trains on those tracks. The yard is located some distance south of the depot, and lies east of the main line track. There are 6 tracks besides the passing track and the main line track in the yard. The yard tracks are used for making up freight trains, for general freight use, and for storing cars. Freight trains are made up on any of the tracks east of the main line track that may happen to be available. The employees, including the deceased, were familiar with the tracks and with the width of the same.

D. R. Ferguson went to his usual work at 2 o'clock p. m. on Sunday, February 12, 1922, and about 7:20 o'clock p. m., just after dark, his body was found lying on the ground between the main line track and the track No. 1, called the passing track. His jumper was torn in the back, and it was bloody. An immediate examination of his body disclosed the following: His right arm was broken; the fifth and sixth ribs were broken; a cut was on the right side, about 2 inches below the armpit, and extending below the armpit deep enough, as described, to "put your hand in the gash"; the back part of the skull on the right side was mashed; and a cut was on the right cheek. He was last seen alive about 6:45 p. m. The administrator relies upon circumstances to show that the deceased was struck and killed by a locomotive of appellant's passenger train called the "Plug," coming from the south, and going north, and arriving at the Leesville station at that time on its regular schedule time of 7:05 o'clock p. m. If he was not struck and killed by the passenger train, then there is no testimony to show how the deceased met his death; for the particular passenger train was the only moving train in the yards, except one freight engine, between 6:30 o'clock and 7:20 o'clock p. m., and the freight engine was operating in the extreme lower south part of the yards between 6:45 and 7:20 o'clock. As appears, the appellant was operating a passenger train, called the "Plug," between Lake Charles and Shreveport, La. In its regular north-bound trips it was due to reach Leesville at 7:05 o'clock p. m., and in this instance it was running north and arrived on regular time at Leesville. According to the record, this train had been operated only between 3

and 4 weeks before the death of deceased. It was shown by the engineer as follows:

"This train, though referred to as an extra, in fact was a regular train, but it had not been put on the regular time card, and that is the reason it was called an extra. I am not sure how long it had been running, but, to my recollection, it was 3 or 4 weeks."

The employees in the yard, including the deceased, knew of the time the train was scheduled to arrive at Leesville, coming from the south and going north. The fireman on the passenger train testified:

"I didn't know anything about Mr. Ferguson being killed at Leesville. I first heard of it at Many, and I noticed blood on the pilot, on the ribs, step, and pilot beam. It was on the right step and was red blood. I then went to Shreveport. I didn't notice whether this was fresh or old blood."

In the latter part of the afternoon, and before the passenger train arrived at Leesville, a freight crew at Leesville was called to make up and carry out a freight train which was to go north. The cars to be used in the freight train were to be assembled and placed on the passing track, No. 1. By or before 6:30 o'clock p. m. the crew of the freight train had assembled and placed on the passing track the caboose and 15 freight cars. Between that time and the time the body of the deceased was found the freight crew were engaged in weighing at the scales certain other freight cars to be put in the freight train. The place where the freight train was being made up was about 1,600 feet south from the depot. The scales used for weighing cars are located 500 feet south of the spot yard. Under his employment, the deceased was required to inspect the cars making up the freight train thus being prepared to be taken out, and to couple up the air hose on them. It appears quite clearly that he had been performing his duty up to at least 6 o'clock p. m. He had inspected the caboose and the string of 15 cars assembled to that hour. At 6 o'clock p. m. he went to his home for his evening meal, and returned to his work at 6:20 o'clock p. m. His home was very near his place of work, some 200 yards distant. He was next seen at 6:45 o'clock p. m. At that moment he was standing at the north end of the string of freight cars then assembled on the passing track, with his hand on the north end of the last car in the string, and was looking north, which was the direction the freight crew were weighing cars. At the time his lantern was sitting on the ground near the end of this box car. No one saw deceased alive after that time. At 7:20 o'clock the body was found on the ground. The roadmaster testified:

"Brakeman Anderson came and notified me that Mr. Ferguson was killed, I went down there immediately. I saw his form in the darkness, and I went a little way to where his lan-

tern was and picked it up and brought it back and looked at Mr. Ferguson. His lantern was setting 77 feet south of his body when I picked it up, or 1,600 feet south of the station, and was 4 feet and 8 inches from the east rail of of the main line track. I made a measurement of the distances. I noticed a cut of cars there, and the cars were on No. 1 track. * * * The lantern was facing the cars on the side or passing track. There was a round mark there in the cinders where the bottom of the lamp was sitting. * * * It was about 40 feet north of where the lantern was sitting that I saw a piece of flesh, and then from there on to where the body lay I saw evidences of where something had been rolling on the ground. No part of the body got under the train, and no part of it was cut off."

The doctor, after describing the wounds, said:

"I observed the ground where the body lay. I helped to pick him up. Close to where he was laying it appeared like that the body had hit—knocked—against the ground and slided a little further towards the depot."

The main line track is straight, and there is no obstruction to the view of a train approaching the yards and depot. The locomotive of the passenger train had a brightly burning headlight, and was operated through the yards, at the point where the body was found, at the rate of speed of "20 or 22 miles an hour." The fireman and engineer both testify that they were keeping a lookout on and along the track, and that Mr. Ferguson was not seen by them on or near the track, although they did see the lantern sitting about midway between the main line and passing track. The locomotive was equipped with a device whereby the light from the headlight may be diminished. It was both the rule and the custom of appellant to keep the headlight burning full power in running a passenger train on the main line track and going through the yard approaching a station. It was shown to be the rule on several large railroad lines.

In approaching the yards, the passenger train made a great deal of noise. The roar of the train was heard by many of the witnesses long before it reached the point where the body of the deceased lay. The deceased's own children heard the train approaching for over a mile. It was a quiet Sunday evening, and there was no noise in the yards to distract attention. Several witnesses on the part of the administrator testify that there was a failure to ring the bell or blow the whistle of the locomotive as it was run through the yards to the depot. But a number of witnesses on the part of the appellant testify to hearing the whistle blown and the bell rung. It was admittedly shown to be the practice of trains, and of this particular passenger train to ring the bell in passing through the yard. The witness Carlisle testified:

"I was watching this train come in, and it did not blow for the station. I was not watching to hear it blow. You can hear these other trains that come in blow; I have heard them blow, and they make a practice of blowing and ringing the bell. I had seen this train come in before, but it did not ring the bell when it came in this time. I had seen it come in lots of times, and it would ring the bell when it came in. It made a practice of ringing the bell before then —what times I had noticed it—and I have watched it from this same place and other places too."

The engineer of the train testified:

"The bell on that engine was rung in passing through that yard that night. We have an automatic bell ringer, and the fireman operates it, and I do the whistling. You just start ringing the automatic bell ringers, and they keep ringing until you shut them off. * * * It was necessary to ring the bell as I went through Leesville, to give warning to any people who might be working in the yard. That was the purpose of ringing the bell, so as to sharply attract the attention of the people that might be there and to let them know the train was coming."

The witnesses in behalf of appellant testify that on the afternoon and evening the deceased was killed he was drunk. One of the witnesses saw him as late as 6 o'clock, and two of them saw him about 5:45 o'clock. One of the witnesses testifies that he drank with him. The children of deceased, and another witness in behalf of the administrator, testify that deceased came home for supper at 6 o'clock and remained there between 20 and 30 minutes, and that he was not drunk. Other witnesses testify that they had known deceased for a long time, and that he was of sober habits, and that they had never known of his drinking, and had never seen him take a drink.

The jury made special findings that: (1) There was a failure to dim the headlight of the engine as the train approached the place of injury, causing D. R. Ferguson to be blinded, and which failure was an act of negligence proximately causing the death of D. R. Ferguson; (2) that the passenger train was being operated at a rate of speed unusual and dangerous, which was negligence proximately causing the death of D. R. Ferguson; (3) that there was a failure to sound the whistle of the engine, and this was negligence proximately causing the death of D. R. Ferguson; (4) that there was a failure to ring the bell of the engine approaching the place of injury, and that such failure was negligence proximately causing the death of D. R. Ferguson; (5) that the deceased was not intoxicated at the time he was struck and killed; (6) that the deceased was not guilty of contributory negligence "in carelessly, or while intoxicated, placing himself in such a position upon or near the main line track that he was struck and killed by an in-coming passenger train in the yards on

February 12, 1922"; (7) that the deceased did not, "by reason of his employment as car inspector, assume the risk of injury such as caused his death." The following two issues were submitted:

"Could D. R. Ferguson, in the exercise of ordinary care for his own safety, and assuming that he knew the time for the arrival of such train, have discovered the approach of such train in time to have prevented being struck thereby? Answer: No.

"Could D. R. Ferguson, by the use of ordinary care on his part, have avoided being struck by the locomotive which is alleged to have struck and killed him? Answer: No."

The jury made a finding as to the amount of damages.

There is evidence, we conclude, to support the findings of fact as made by the jury: That the passenger locomotive struck and killed the deceased; that the operatives of the locomotive were guilty of negligence in failing to ring the bell in approaching the station of Leesville through the yards, and that such negligence had casual connection with the death; that the deceased did not assume the risk and danger of being struck and killed by the locomotive under the circumstances. It was admittedly proven that it was the practice to keep the bell ringing in going through the yard, and that, as found by the jury, the bell was not rung in this instance. The deceased had the right to rely upon such practices. We further conclude that the evidence does not warrant the findings as made by the jury: That the efficient cause of the death was the failure to diminish the light of the headlight or the speed of the train at the time, or the failure to blow the whistle; that the deceased was using due care under all the circumstances. The deceased was not on the main line track. He was outside the rails of the main line track, but near enough to the outside rail to be struck by the pilot beam of the engine. He was not facing the approaching locomotive, and was not blinded by the headlight and confused as to his whereabouts. All the circumstances point to the fact that he contributed to the cause of his death by knowingly remaining in a position to be struck by a train which he had reason to expect, and the glare of the headlight, and the rattle of which he could have seen and heard when it was some distance away. Each issue of negligence was separately submitted and found by the jury to be a distinctive act of negligence.

King, Mahaffey & Wheeler, of Texarkana, for appellant.

Jones, Sexton & Jones, of Marshall, and Keeney & Dalby, of Texarkana, for appellee.

LEVY, J. (after stating the facts as above). The propositions of appellant in effect present the three points of view that the evidence speaks unequivocally (1) of the lack of any negligence on the part of appellant proximately causing the death of D. R. Ferguson; (2) of the negligence of the deceased at the time of injury, which wholly or partly resulted in his death; and (3) of assumed risk by the deceased of injury from the regular train running on the main line on schedule time, the deceased being familiar with the time the train was due, and he having no duties to perform at the time on the main line track. The fact can be conceded that the deceased was struck and killed by the passenger locomotive as it was going through the yard to the depot.

The inference from the circumstances is quite clear that the train killed him. Yet it is apparent from the evidence that an occasion of blame for the death cannot be predicated upon running the train at a high rate of speed or in not diminishing the light of the headlight while going through the yard. Neither ground of such alleged negligence distinctly pleaded and relied upon, was the efficient cause of the injury and death, in the sense that the death would not have occurred without such negligence. It is clear that the deceased was not on the main line track at the time he was struck. The physical injuries on his body disclose that no part of his body was cut off by the wheels, which necessarily would have resulted had he been in the direct pathway of the locomotive. And it is equally as clear, as indicated by the injuries on his body and the blood spots on the steps of the pilot, that the deceased was sitting on or squatting near the outer ends of the ties from the east rail of the main line track, and that he was not standing on his feet erect. He was performing no duties on the main line track. It is plain that the deceased was facing east or northeast. The train was coming from the south. Under such circumstances it would be an unwarranted assumption that the deceased was blinded by the headlight and so confused as to his whereabouts as to step in the direction of the train without knowing it, or that the speed of the train, of itself and by itself, wholly or partially caused the injury. It is true that the locomotive was equipped with the regulation headlight, in compliance with the order of the Interstate Commerce Commission, and that the light of the headlight was not diminished in going through the yard. Under the terms of the said regulation it is not per se a violation of such order to fail to dim the headlight, but it becomes negligence vel non according to the circumstances of each case. And, assuming it to become an act of negligence in this case to fail to dim the light, such negligence was not the proximate cause, under the evidence and the physical circumstances, of the injury and death. We think it conclusively so appears.

[1] There is not, however, an entire absence

of evidence of negligent failure to ring the bell as the train was going through the yard. At least the doubtful condition of the evidence requires the question, in legal contemplation, to be left to the jury, and not determined as a matter of law by this court. It was the practice to ring the bell in going through the yards, and the deceased had the right to rely upon the practice; and there was failure to ring the bell, as found by the jury, in this instance. Such negligence could be regarded as a proximate cause of the injury and death.

We next inquire as to what support there is for the finding as to the deceased's own care or caution under all the circumstances. The last time he was seen alive was at 6:45 o'clock p. m. At that time he was standing at the north end of the string of cars then assembled on the passing track, with his hand on the north end of the last car in the string. His lantern was sitting on the ground near the end of this box car, and he was facing north. This was 20 minutes before the passenger train arrived. As seems evident, during these 20 minutes he was not performing any duty there, although expecting more cars to be ultimately brought up to go in the train being made up. He was not engaged in inspecting the cars and in coupling them, as that work had been done as to the string of cars assembled. He was waiting for more cars to be brought there. The freight crew were still weighing cars at the scales. And the manner in which and the fact that he was hit by the locomotive indicates that he did not remain standing near the end of the box car, but that he moved back nearer to the main line track, and there sat down on or squatted near the ends of the ties. His injuries were entirely on the back of the head and the rear of the right side near the armpit, and not below the sixth rib. The blood on the locomotive was "on the pilot, on the ribs, and right step, and the pilot beam." The deceased was 5 feet and 9 inches tall, and there was no injury to his body below the sixth rib. The step on the pilot which reached to the height to do so, evidently cut the deep gash in the rear of his right side near the armpit, and the pilot beam evidently struck and mashed the skull on the rear of the right side. That the deceased knew, as did the other yardmen, that the passenger train was likely to pass at 7:05 o'clock, and that it was about that hour when he assumed that position near the track, is not open to question. It was not a proper place to be. It is shown that the roar of the train was great. His children at the home, not more than 200 yards distant from him, heard the roar for half a mile away. Others heard it. It was affirmatively shown that it was a quiet Sunday night, with no noise in the yards. It does not appear that the wind was blowing. It was not shown that deceased's hearing was not good, so that he could not hear the roar of the approaching train. The headlight, too, was casting a bright light ahead 700 or 800 feet. He had ample opportunity to acquaint himself with the peril incident to the situation which led to his being injured. Then why did he remain so near the track after he could hear the train and see the light in ample time to step away? The law devolves this duty on the deceased, and there is really nothing to explain such conduct or excuse the failure to use due care to leave the position of peril incident to the situation near the main line. He could not have been in a better position to hear the approaching train. The same is true with reference to his seeing the light.

[2] We must assume, in the absence of evidence to the contrary, that deceased was possessed of normal hearing and sight. If he had exercised either faculty, as it was his duty to do, he could easily have heard or seen that train in time to get away from such close proximity to it. If he did not hear or see it, it was solely because he was not in the least attentive. It is pure conjecture that the deceased thought he was in safe distance from the approaching train. We think the facts of the case clearly overcome any presumption arising from the rule as to instinct of self-preservation. We are not disposed to deny to the deceased the benefit of that rule, so often announced, that the jury may assume from the instinct of self-preservation that a person is diligent to escape injury. But in each of the cases the injury happened when the person was intently engaged at the moment in the line of employment; and, in some, if not all of them, his conduct is traced so closely to the accident that from it, aided by a presumption that arises from a natural disposition to avoid injury, the fact of diligence could well be founded. This is not the situation of this case, and the circumstances are not as favorable as that for the deceased. The deceased failed to use any diligence to get away from the approaching train, having time to do so; and a judicial finding to the contrary is not warranted. Therefore, in determining the result of the case, it is essential to view the conduct of the railway company and of the deceased as a whole, and note the bearing the acts of each had upon the resultant injury. The negligence of the railway company, as could be found by the jury, in failing to ring the bell, as customarily done, was not the sole cause, but a concurring cause of the injury. The negligence of the deceased contributed to his injury. Hence the injury was partly the result of the negligence of the company and of the negligence of the deceased; the legal consequence being, as they each were in fault, the amount of recovery should be diminished, as that is the legal effect of contributory negligence. The present verdict is then excessive, as no deduction of amount was made by the jury. This court cannot direct a remittitur, since the parties to the suit are en-

titled to a jury finding in that respect. It is incumbent upon this court to remand the cause in such situation.

[3] As to the third proposition, we conclude that assumed risk is not applicable in the circumstances, in the view that the only actionable negligence was the failure to ring the bell as was customarily done. Even if the deceased could be held to have assumed the risk from the operation of the train, on account of his knowledge of the schedule time of its arrival, he cannot be said to have assumed the additional risk caused by failure to follow the customary practice of ringing the bell.

The judgment is reversed, and the cause is remanded for another trial.

### On Motion for Rehearing.

Both the appellant and the appellee have filed motions for rehearing, which are here considered and disposed of. The appeal was heretofore disposed of on two grounds: First, that there was evidence to support the jury finding of negligence in the particular instance in failing to ring the bell of the passenger engine, as customarily done in approaching the station of Leesville through the railway yards, and that such negligence could be regarded as a proximate cause of the injury and death, since the deceased had the right to rely upon the practice; he being rightfully at the place where he was working. If the witnesses so testifying are believed, there is proof rendering probable the existence of the fact, as found by the jury, that the bell of the engine was not kept ringing through the yards in the particular instance, as customarily done. It is not entirely improbable in the circumstances that such failure of warning was a cause of the deceased being struck by the engine. Therefore the question of actionable negligence vel non in that respect remains in the domain of open fact and not of pure law, after all the evidence has been considered. We have further considered the other contentions of appellant's motion, and conclude that they should be overruled.

[4] The second ground was that the evidence conclusively showed the injury was partly the result of the negligence of the deceased, and as a consequence the jury's finding to the contrary should be set aside because it was contrary to the legal effect of the evidence. This conclusion was based upon the determination made that all the circumstances united in indicating the deceased, several minutes before the train arrived—

"moved back (from the end of the box car) nearer to the main line track and there sat down or squatted near the ends of the ties. * * * The deceased knew, as did the other yardmen, that the passenger train was likely to pass at 7:05 o'clock and that it was about that hour when he assumed that position near the track. * * * It was not a proper place to be.

* * * The deceased failed to use any diligence to get away from the approaching train, the glare of the headlight, and the rattle of which he could have seen and heard when it was some distance away."

If that is not a correct determination of the facts, then the ruling made is erroneous; otherwise it is not wrong. Both the appellant and the appellee now challenge the conclusion of fact, and say "there is no evidence from which the jury or the court could reasonably find that deceased was sitting or squatting dangerously near the track." Reference is made to the evidence of the engineer and fireman. The engineer testified:

"In going through that yard, I was keeping a lookout. I did not see Mr. Ferguson or any other man on or near the tracks in going through the yards that night. I did see a lantern—a car repairer's lantern—sitting on the ground between the main line track and the passing track. I did not see Mr. Ferguson or any other man there about that lantern. I can see the ground within a few feet of the end of the pilot."

The fireman testified:

"I was keeping a watch ahead in going through Leesville that night. I did not see any man on the tracks or near the tracks as we were passing through the yards. The headlight was giving a good light, so that I could see along the track through the yard there. I saw a lantern as I went through the yard, between the main line and passing track."

The failure to note the significance of this evidence of the operatives of the engine in the large record is inexcusable, at least on the part of the writer of the opinion. A change of the fact mentioned changes the legal conclusion reached, to the extent that contributory negligence appeared as a matter of pure law. If the engineer and fireman are to be believed, and no reason appears why they should not be, then the deceased, for an appreciable period of time prior to his injury, was not knowingly standing and remaining in a position to be struck by the oncoming train, having time to avoid being struck by it. Hence it is thought, after all the substantive evidence had been considered, that the ultimate question of negligence vel non on the part of the deceased contributing to his injury remains in the domain of open fact for decision by the jury. There is proof rendering probable the existence of the fact, as was found by the jury, that the deceased did not "carelessly or while intoxicated place himself in such position upon or near the main line track that he was struck and killed by an in-coming passenger train." We have accepted the fact that the on-coming passenger engine struck and killed the deceased. The deceased was rightfully between the two tracks, in the duties required of him at the time. He was between the two tracks, near the string of box cars he had inspected, im-

mediately before the passenger train came along, in waiting for the switch engine to come back with more cars to be inspected. And the evidence of the engineer and fireman can be accepted as meaning that the deceased was not, prior to the very moment of being struck, in a position of such nearness to the main line track as to be struck by the engine. It is not difficult to conceive that the deceased must have stepped in the path of the engine at some moment of its passing, with the result of being struck and killed by the pilot beam or pilot of the engine, although he was not seen prior to that moment by the operatives of the engine. The inference is allowable that the deceased must necessarily have stepped quickly in the way of the engine for some cause, coming from somewhere very near the engine. The engine was running at the time "20 or 22 miles an hour." Therefore, given the two premises, that the passenger engine struck and killed the deceased, and that he was not in or near the path of the engine before the moment he was struck by it, it does not follow in a way too certain for doubting that the act and conduct of the deceased were lacking in due care to avert his injury. There is an absence of something else which would weigh mightily before negligence as a matter of pure law could be imputed to him, which is the fact of whether or not deceased was aware of the approaching train, and in time to have avoided being struck by the engine. In view of the rattling noise of the train and the glare of the headlight on the engine, in connection with the fact that the deceased knew the train was about due, it is difficult to impute to him utter ignorance of the approaching train. Yet it is not wholly improbable that he was in reality unaware of the nearness of the engine to him. The conduct and act of the deceased are not necessarily inconsistent with due care on his part to avert the injury. It can be necessarily assumed from the instinct of self-preservation that he did not knowingly and deliberately place himself in the way of the engine to be struck. The jury expressly found that the deceased was not drunk. And the circumstances are not entirely unfavorable to the presumption that the deceased had mistakenly stepped in the path of the engine, due to deep confusion from some cause. As the evidence bearing upon the conduct of the deceased just prior to his being struck by the engine does not conclusively indicate that the deceased was unmindful of the danger of his surroundings, the entire matter was for the jury, as in their province to say, under our system of law.

We have considered appellant's other assignments of error, and think they should be overruled.

We grant the motion for rehearing, now set aside the former judgment of reversal, and here now enter a judgment of affirmance.